UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ATHANASIOS GIONIS and
EVDOKIA GIONIS,

And all others similarly situated;

Plaintiffs,

Case No. _____

versus

(JURY DEMAND)

BP, PLC; BP AMERICA, INC.; BP CORPORATION
NORTH AMERICA, INC.; BP COMPANY NORTH
AMERICA, INC.; BP PRODUCTS NORTH AMERICA,
INC.; BP EXPLORATION & PRODUCTION, INC.;
ANADARKO PETROLEUM CORP.; MOEX OFFSHORE
2007, LLC.; HALLIBURTON ENERGY SERVICES, INC.;
CAMERON INTERNATIONAL CORPORATION f/k/a/
COOPER CAMERON CORPORATION; and M-I, LLC;

     Defendants.

_____/

## PLAINTIFFS' CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Athanasios Gionis and Evdokia Gionis, on their own behalf and as representatives of the class defined herein, bring this class action against Defendants, BP, PLC; BP America, Inc.; BP Corporation North America, Inc.; BP Company North America, Inc.; BP Products North America, Inc.; BP Exploration & Production, Inc; Anadarko Petroleum Corp.; MOEX Offshore 2007, LLC; Halliburton Energy Services, Inc.; Cameron International Corporation f/k/a Cooper Cameron Corporation; and M-I, LLC as follows:

## I.      INTRODUCTION

1.      Plaintiffs, who jointly own real property located on navigable waters adjacent to the Gulf of Mexico in Clearwater, Florida, brings this class action, on behalf of themselves and all others similarly situated, against Defendants for losses and damages arising out of the catastrophic negligently-caused oil spill off the U.S. Gulf Coast that followed the April 20, 2010 explosion and fire aboard the Deepwater Horizon oil rig ("Deepwater Horizon"), and the subsequent sinking of that rig and the ongoing discharge of oil into the surrounding water.

2.      On April 20, 2010, the Deepwater Horizon, an oil rig in the Gulf of Mexico, exploded and caught fire. It burned for two days before tipping into the sea, on its way bending and breaking the long riser pipe connecting the rig at the surface to the wellhead at the seafloor. As the Deepwater Horizon sank, it broke off the riser, leaving the pipe leaking oil out of its unrestricted end, as well as through two breaks along its length. An emergency valve, installed on the wellhead for just such a disaster, failed to seal the wellhead as it should have, leaving the well spewing oil into the Gulf waters.

3.      Since April 20, 2010, tens of millions of barrels per day of crude oil have been leaking from the wellhead and broken riser, generally rising to the surface and flattening out into a slick of oil of unprecedented breadth. The growing, fast-moving, toxic smear is large enough to be visible from outer space, covering tens of thousands of square miles, and spreading with the wind and currents towards the Florida coastline.

2

4.      The spilled oil has already caused damage to the marine and coastal environments of Florida and the Gulf of Mexico, where Plaintiffs' property is located. With the wellhead unabatedly gushing vast quantities of oil per day into the waters near Florida, Plaintiffs and Class Members are suffering and will continue to suffer serious damages.

## II.      PARTIES

5.      Plaintiffs Athanasios and Evdokia Gionis are U.S. citizens and residents of Clearwater, Florida. Plaintiffs jointly own their marital homestead, located in the Island Estates neighborhood of Clearwater Beach, in Pinellas County, Florida ("the Gionis home"). The Gionis home is located directly on the Intracoastal Waterway with immediate access to the Gulf of Mexico. The Gionis home is equipped with a dock and boathouse, which is outfitted with a davit system to keep their fishing boat. The Gionis home, which they purchased in 1976, was Plaintiffs' most valuable asset until its value was eviscerated as a result of Defendants' conduct as further stated herein. As a result of Defendants' conduct and the ensuing spill, the Gionis home has experienced a dramatic loss of value, and will continue to suffer a diminution of value for the rest of its useful life.

6.      As a result of the events described herein, Plaintiffs have suffered quantifiable losses and damages.

3

7.     Defendant BP, plc is a British corporation, organized under the laws of the United Kingdom, doing business in the State of Florida and throughout the United States. BP is one of the world's largest oil companies.

8.     Defendant BP America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, and doing business in the State of Florida and throughout the United States.  BP America, Inc. is a subsidiary of BP, plc.

9.     Defendant BP, Corporation North America, Inc. (formerly BF Amoco Corporation) is an Indiana corporation with its principal place of business in Houston, Texas, and doing business in the State of Florida and throughout the United States.  BP Corporation North America, Inc. is a subsidiary of BP America, Inc.

10.     Defendant BP Company North America, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, and doing business in the State of Florida and throughout the United States.  BP North America, Inc. is a subsidiary of BP, Corporation North America, Inc.

11.     Defendant BP Products North America, Inc. is a Maryland corporation with its principal place of business in Houston, Texas, and doing business in the State of Florida and throughout the United States.  BP Products North America, Inc. is a subsidiary of BP, Company North America, Inc.

12.     Defendant BP Exploration & Production, Inc. is a Delaware corporation with its principal place of business in Warrenville, Illinois, and executive address in

4

Houston, Texas, and doing business in the State of Florida and throughout the United States. BP Exploration & Production, Inc. was the lease operator of the Deepwater Horizon at the time of the explosion.

13.     Defendants BP America, Inc., BP Products North America, Inc., BP Corporation North America, Inc., BP Exploration & Production, Inc., and BP Company North America, Inc. are wholly-owned subsidiaries of the global parent corporation, BP, plc, and they shall be referred to herein collectively as "BP".

14.     BP holds the lease granted by the U.S. Minerals Management Service ("MMS") that allows BP to drill for oil and perform oil-production- related operations at the Macondo site in the in the Mississippi Canyon Block 252 section of the outer continental shelf of the Gulf of Mexico. At all times material hereto, BP operated the Macondo oil well that is the source of the current oil spill.

15.     Defendant Anadarko Petroleum Corp. ("Anadarko") is a Delaware corporation with its principal place of business in The Woodlands, Texas, and doing business in the State of Florida and throughout the United States. Anadarko is an oil and gas exploration and production company that owns a 25% interest in the Macondo well at Mississippi Canyon Block 252.

16.     Defendant MOEX Offshore 2007, Inc. ("MOEX") is incorporated in Delaware with its principal place of business in Houston, Texas, and doing business in the State of Florida and throughout the United States. MOEX Offshore 2007, Inc. holds a 10% interest in the Macondo well at Mississippi Canyon Block 252.

17.     At all times material hereto, the Deepwater Horizon was owned, manned, possessed, managed, controlled, chartered and/or operated by BP, or under the authority and direction of BP.

18.     Defendant Halliburton Energy Services, Inc. ("Halliburton") is a Delaware corporation with two headquarters, one in Houston, Texas and one in Dubai, United Arab Emirates, and doing business in the State of Florida and throughout the United States. Halliburton is one of the world's largest providers of products and services to the energy industry. Aboard the Deepwater Horizon, Halliburton was engaged in the cementing operations of the well and well cap.

19.     Defendant Cameron International Corporation f/k/a Cooper Cameron Corporation ("Cameron") is a Delaware Corporation with its principal place of business in Houston, Texas, and doing business in the state of Florida and throughout the United States. Cameron is a global provider of pressure control, processing, flow control and compression systems as well as project management and aftermarket services for the oil and gas industries. Cameron manufactured and/or supplied the Deepwater Horizon's emergency blowout preventer valve ("BOP") that failed to activate at the time of the explosion.

20.     Defendant M-I, LLC ("M-I") is a Texas corporation with its principal place of business in Houston, Texas, and doing business in the State of Florida and throughout the United States. M-I, also known as M-I SWACO, supplies drilling and completion fluids and additives to oil and gas companies, providing pressure control, rig

instrumentation, and drilling waste management products and services. M-I provided drilling fluids for the Deepwater Horizon at the time of the explosion.

### III. JURISDICTION AND VENUE

21. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and it is a class action brought by citizens of a State that is different from the State where at least one of the Defendants is incorporated or does business.

22. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy.

23. This Court's venue over this action is proper under 28 U.S.C. § 1391 (a)(2) because Plaintiffs who suffered injury reside in this district

### IV. FACTUAL ALLEGATIONS

24. The Deepwater Horizon was an ultra-deepwater dynamic positioned semi-submersible oil rig built in 2001. It was leased to BP through September 2013. It was among the largest rigs of its kind.

25. BP leased the Deepwater Horizon to drill exploratory wells at the Macondo prospect site in Mississippi Canyon Block 252, a location on the U.S. outer continental shelf.

26.     On April 20, 2010, the Deepwater Horizon was creating a cement seal and plug of the wellhead as part of the final phases of turning the Macondo well from an exploratory well into a production well. "Cementing" a wellbore is delicate work that carries the risk of a blowout, which is the uncontrolled release of gas and oil from the well.

27.     During the course of this cementing work, an explosion occurred on the Deepwater Horizon and it caught fire, causing the deaths and injuries of many workers on the rig. Investigators believe the explosion was a blowout, a sudden surge of gas into the wellbore, possibly caused by the cementing work the Deepwater Horizon had been performing.

28.     Investigations and testimony have revealed a complex cascade of deep-sea equipment failures and procedural problems thought to have caused the explosion of the Deepwater Horizon and the subsequent oil spill.

29.     According to these sources, the first sign of trouble with the Macondo came shortly before dawn on the day of the explosion. The well failed a key "negative pressure test," done to make sure underground gas could not seep into the well. Failure meant the well might be leaking. Workers ran a second negative pressure test; the well failed again.

30.     According to sources on the rig, Defendant Halliburton was using a new type of cement to seal the wellbore – a mix infused with nitrogen and other chemicals, supposedly able to set faster than standard cement. But the chemicals added to the new

cement can create substantial amounts of heat, which can thaw crystallized gas so that it releases up the wellbore in blowouts like the one aboard the Deepwater Horizon. The new cement could also have been a cause of the uneven pressure in the well that was indicated by the failed negative pressure tests.

31.    Despite the two test failures indicating the well could have a dangerous leak or pressure imbalance, work resumed on the well. Heavy drilling fluid was pumped out of the riser pipe connecting the wellhead with the rig, replaced with lighter, less-dense seawater in preparation for placing the last cement plug in the wellbore. Without heavy drilling fluid to exert downward pressure in the wellbore, any leak in the well could turn dangerous very quickly, with only relatively light seawater blocking its path up the wellbore, through the riser and the surface.

32.    The last cement plug was still missing from the wellbore just before 10 p.m. on April 20, 2010, when drilling fluid pushed by rapidly expanding underground gas started kicking up uncontrollably through the well, with nothing but seawater to stop it.

33.    The desperate rig workers tried to activate the BOP that was installed to squeeze off the surge in just such an emergency. Unfortunately, hydraulic fluid leaking from a loose fitting hindered the activation of the BOP's powerful shear rams to cut the piping and cap the blowout. A battery had gone dead in at least one of two control pods meant to automatically switch on the BOP in an emergency.

34.    After the explosion, the resulting fire on the rig burned for two days, and the rig began to list progressively more until it finally sank on April 22, 2010. The

Deepwater Horizon had been connected to the wellhead at the seafloor by a 5,000 foot pipe called a rise. As the Deepwater Horizon sank to the seafloor, it pulled the riser down with it, bending and breaking the pipe before finally tearing away from it completely. The riser, bent into a crooked shape underwater, now extends from the well to 1,500 feet above the seabed and then buckles back down. Oil is flowing out from the open end of the riser and from two places along its length.

35.  The BOP has still not been activated. Workers spent a day trying to close one of the rams without realizing it had been replaced by a useless test part. Investigations later showed that the BOP had been modified and the schematic diagrams for the device were not accurate.

36.  At the May 12, 2010 Senate hearings on the causes of the explosion and spill, testimony showed that the BOP may have failed for four reasons: after-market modifications to it may have reduced the number of shears that could close the well; a hydraulic leak may have disabled it; the shear rams may not been powerful enough to cut through the riser pipe, or may have hit a section of pipe that was too thick to cut; and the battery power to one of more of its activator switches may have died.

37.  It the BOP on the wellhead had been functional, it could have been manually or automatically activated right after the explosion, cutting off the flow of oil at the wellhead, limiting the spill to a minute fraction of its current severity and thereby sparing Plaintiffs and Class Members billions of dollars in losses and damage.

38.     The risks of offshore drilling are well known to Defendants, and are especially high in the Gulf of Mexico, where floating rigs are used, unlike the permanent rigs used in other areas such as the North Sea. Permanent rigs are anchored to the ocean floor and cannot sink, while floating rigs are more precarious and subject to disastrous results like this incident.

39.     Moreover, Defendants knew the work the Deepwater Horizon was performing was especially risky. In 2007, the MMS raised concerns about oil rig blowouts associated with the exact type of cementing work the Deepwater Horizon was doing when it exploded.

40.     Although blowouts due to other causes were on the decline, the MMS study noted that blowouts during cementing work were continuing with regularity, and most frequently in the Gulf of Mexico. Cementing problems were associated with 18 of 39 blowouts between 1992 and 2006, and 18 of 70 from 1971 to 1991. Nearly all the blowouts examined occurred in the Gulf of Mexico.

41.     Defendants were aware of the recent August 2009 blowout in the Timor Sea, which was found to have been caused by careless cementing work performed by Defendant Halliburton. During that incident, which bears a strong resemblance to the Deepwater Horizon blowout, oil leaked from the site for ten weeks, spreading damage over 200 miles from the well site.

42.     The threat of blowouts increases as drilling depth increases. Deepwater Horizon was drilling 5,000 feet of water to a total depth of at least 18,000 feet below the

sea floor. Some recent reports have indicated that the Deepwater Horizon may have been drilling even deeper, below 22,000 feet, far deeper than its MMS permit allowed. Defendants were aware of the high risk of blowouts from such deep drilling.

43.     In addition to increasing the risk of blowouts, deep-sea drilling also increases the failure risk of the chief blowout safety mechanism, the BOP. Defendants were aware of the risk of the BOP failing at greater depths, yet did not install a backup BOP activation system or back up BOP.

44.     A 2004 study by federal regulators showed that BOPs may not function in deep-water drilling environments because of the increased force needed to pinch and cut the stronger pipes used in deep-water drilling. Only three of 14 rigs studied in 2004 had BOPs able to squeeze off and cut the piper at the water pressures present at the equipment's maximum depth. "This grim snapshot illustrates the lack of preparedness in the industry to shear and seal a well with the last line of defense against a blowout," the study said. Moreover, the study singled out Cameron, the manufacturer of the Deepwater Horizon's BOP, for relying on faulty calculations to determine the needed strength for its BOP equipment to function properly at greater depths.

45.     Defendants could have installed a back up trigger to activate the BOP in the event of the main trigger failing to activate it. In fact, in 2000 the MMS told Defendants and other oil rig operators that it considered a backup BOP activation system to be "an essential component of a deepwater drilling system." Despite that notice and although the backup trigger is a common drill-rig requirement in other oil-producing

nations, including other areas where BP operates, the Deepwater Horizon was not equipped with this backup remote BOP trigger.

46.     Nor was the Deepwater Horizon equipped with a second, backup BOP, as newer rigs increasingly are. The Deepwater Horizon only had one BOP installed, leaving the wellhead vulnerable to disaster if the single BOP fails, as it may have done in this case.

47.     Defendants in fact knew that this particular well posed a particularly strong blowout risk. The Macondo well had been shut down for fear of an explosion after a large release of natural gas just weeks before the fatal explosion at issue herein. Rig workers reported that the Macondo well had consistently proven problematic, with pockets of natural gas regularly kicking up the drill pipes in highly flammable bursts. The government had even warned BP that the gas buildup in this well was a concern and that BP should "exercise caution." Nevertheless, BP and the other Defendants continued their work, seemingly without exercising any additional caution, despite the known risks of performing delicate cementing work on a gas belch-prone well drilled in extremely deep water on a floating platform, with only one emergency BOP that might not even function because of the drilling depth.

48.     Defendant BP has a history of cutting corners on safety to reduce operating costs. In 2005, a blast at a Texas refinery killed 15 people and injured more than 170; Federal investigators found the explosion was in part due to cost-cutting and poor facility maintenance. Also in 2005, a large production platform in the Gulf of

Mexico began listing severely due to a defective control system. And in 2006, four years after being warned to check its pipelines, BP had to shut down part of its Prudhoe Bay oilfield in Alaska after oil leaked from a corroded pipeline. Moreover, former employees and oil field workers who worked with BP have reported that BP regularly cheated on pressure tests and failed to report leaks and spills to the proper authorities. Most recently, reports revealed that BP is operating its Atlantis rig – a deepwater rig similar to the Deepwater Horizon -- with incomplete and inaccurate engineering documents, which one official warned could "lead to catastrophic operator error" and disaster like the fate of the Deepwater Horizon.

49.     Nevertheless, BP continues to fight for less regulation of the oil exploration and production industry. In 2009, BP spent more than $16 million lobbying the Federal government on issues including encouraging removing restrictions on drilling on the continental shelf, despite its history of spills and explosions and its knowledge of the high risks involved in such drilling.

50.     Moreover, Defendants have actively opposed MMS rules requiring oil rig lessees and operators to develop and audit their own Safety and Emergency Management Plans, insisting that voluntary compliance will suffice. The Deepwater Horizon incident is a tragic example to the contrary.

51.     The explosion and fire on the Deepwater Horizon, its sinking and the resulting oil spill were caused by the negligence of Defendants, which renders them jointly and severally liable to Plaintiffs and the Class Members for all their damages.

52.     Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, the Class Members, and beachfront and coastal areas of Florida and the Gulf Coast, where Plaintiffs' and the Class Members' property is located. Moreover, additional safety mechanisms, technologies, and precaution were known and available to Defendants, but Defendants chose not to employ them on the Deepwater Horizon.

53.     After the explosion, Defendants attempted to downplay and conceal the severity of the oil spill. Their initial leak estimate of 1,000 barrels per day was found by later reports to be a small fraction of the actual leak amount of up to 70,000 barrels of oil per day. Defendants were slow and incomplete in their announcements and warnings to Gulf Coast residents and businesspeople about the severity, forecast, and trajectory of the oil spill. Even now, Defendants refuse to let scientists accurately measure the plumes of oil beneath the surface to get a more specific reading on the size and rate of the spill.

54.     At the time of this filing, the wellhead has not been capped and the flow of oil continues unabated into the Gulf waters. The ever-expanding oil slick made landfall on Friday morning, April 30, 2010, and will continue to affect more and more of the Gulf coastline as it is driven landward by currents and winds. Although BP has begun drilling a relief well to stop the flow to the leaking well, the relief well will take months to complete, while oil continues to flow out of the leaking well.

55.     While the media has compared this spill to the 1989 Exxon Valdez disaster, one crucial difference is that the Valdez was a tanker with a limited supply of

15

oil. Experts estimate that the volume of this continuous gush of oil has already eclipsed that of the Valdez spill, virtually ensuring this spill's classification as the worst oil spill in history.

56.    In addition to the vast quantities of toxic crude oil, Defendants, in an effort to mask the magnitude of the spill, have discharged unprecedented quantities of toxic dispersants, against the instructions of the U.S. Environmental Protection Agency, which have altered the chemical composition of the spill and magnified its persistence and toxicity. The crude oil, in combination with Defendants' dispersants, will hereinafter be referred to as "the spill".

57.    As the spill continues to make landfall further along the Gulf Coast, it will cause severe damage to the white sand beaches and pristine marshes that line the coast of Florida, destroying their natural beauty and diminishing the value of waterfront property.

58.    The timing of this disaster makes it even more damaging, as May is the ramp up to the tourist season, when vacationers begin planning their trips for summer vacations, in particular for diving trips. The physical and reputational sullying of Florida's pristine waters by the spill has already resulted in cancellations of pre-booked trips, and will continue to defer vacationers from employing the services of Plaintiff's and Class Members.

59.    Florida ranks number one among the nation's destinations for Americans that swim, fish, dive, and otherwise enjoy the state's many beaches, coastal wetlands, and shores. There are over 250,000 seasonal, or vacation, homes or housing units on the Gulf

16

coast of Florida. More than 20 million people per year visit the Florida coasts, including 15 million beachgoers annually. Boaters alone add $19 billion per year to Florida's coastal economy, purchasing marina services, food, and entertainment.

60.     After Florida's coastline is damaged by the spill, vacationers, beachgoers and boaters have started to avoid, and will continue to avoid the state, planning trips to other destinations instead. The stigma of the spill may last even longer than the actual environmental damage, further affecting Florida's coastal economy for years to come. Prior to the spill, employment projections for Florida's coastal economy from 2005-2015 predicted a 73% growth and more than 268,000 new jobs. The spill will reverse that growth as tourists cancel existing bookings and choose alternate destinations for their vacation travel. All of these factors will further diminish real property values on Florida's coasts and within its Coastal Zone.

61.     The world-wide public perception that Defendants have permanently despoiled Florida and ruined its entire coast as a vacation and recreational destination is well-founded. The spill will eventually be picked up by the Gulf of Mexico's "loop current," spreading it to the east and along a "conveyor belt" down the entire Gulf coast of Florida, through the Florida Keys, and into the Atlantic, where the near-shore Gulf Stream will deposit Defendants' spill onto Florida's Atlantic coast beaches.

62.     The spill and the resulting contamination have caused and will continue to cause loss of revenue to individuals and businesses located on the Gulf of Mexico and all

17

of Florida's shores. This effect will further diminish real property values on Florida's coasts and within its Coastal Zone.

63.      There are many other potential effects from the spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

## V.    CLASS DEFINITION

64.      Plaintiffs bring this action on behalf of themselves and all others similarly situated, who are members of the following Class:

> All persons or entities who have an ownership interest in real property located in the Florida Coastal Zone, as defined by 43 U.S.C. § 1331(e), and within one mile of the Florida coast (including the shores of any and all bayous, inlets, rivers, lakes, bays and other bodies of water that are tidally influenced), from April 20, 2010 through [the date of certification].

65.      Excluded from the Class are:

a) The officers and directors of any of Defendants;

b) Any judge or judicial officer assigned to this matter and his or her immediate family;

c) Any individual who has claims for personal physical, bodily injury as a result of the April 20, 2010 explosion and fire that is the subject of this action; and

d) Any legal representative, successor, or assign of any excluded person or entities.

VI.    **CLASS ACTION ALLEGATIONS**

66.    Plaintiffs' claims are made on behalf of itself and all others similarly situated under Rule 23 of the Federal Rules of Civil Procedure.

A.    **Numerosity of the Class**

67.    On information and belief, the Class consists of hundreds or thousands of individuals and/or businesses who have been legally injured by the disaster, making joinder impracticable.

B.    **Typicality and Commonality**

68.    The claims of the representative Plaintiffs are typical of the claims of the Class in that the representative Plaintiffs, like all Class Members, has suffered adverse effects proximately caused by the disaster.

69.    Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all members of the Class.

## C.   Adequacy

70.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting environmental, mass tort, and complex class actions, including actions involving environmental contamination and, specifically, catastrophic oil spills.

71.     Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

## D.   Predominance of Common Questions of Fact and Law

72.     There is a well-defined community of interest in that the questions of law and fact common to the Class predominate over questions affecting only individual Class Members and include, but are not limited to, the following:

   a) **Whether Defendants caused and/or contributed to the explosion, fire, and oil spill;**

   b) Whether Defendants were negligent in the design, maintenance, manufacture, and/or operation of the oil rig, its pipes, valves, and the machinery and materials;

   c) **Whether Defendants knew or should have known of the risk of a major failure of the rig such as that which caused it to fail and resulted in the explosion, fire, and oil spill;**

d)  Whether Defendants recognized or should have recognized the warning signs of a potential gas blowout prior to the explosion;

e)  Whether Defendants knew of, or should have utilized, all available safety mechanisms to prevent a blowout and/or seal the wellhead;

f)  Whether Defendants knew or should have known that their activities would cause damage to Plaintiffs;

g)  Whether Defendants acted maliciously or with reckless disregard to the risk of a major failure of the rig, its pipes, valves, and other machinery and materials; and

h)  The amount of damages Plaintiffs and the Class Members should receive in compensation.

## E.   **Superiority**

73.   Absent class treatment, Plaintiffs and Class Members will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

74.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Without a class action, individual Class Members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights. Because of the ratio of the economic value of the individual Class Member's claims in comparison to the high litigation costs in complex environmental cases such as this, few could likely seek their rightful legal recourse. Absent a class action, Class Members would continue to incur harm without remedy.

75.     The consideration of common questions of fact and law will conserve judicial resources and promote fair and consistent resolution of these claims.

## FIRST CLAIM FOR RELIEF

### Negligent Trespass

76.     The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

77.     Defendants' conduct and the resulting events as described in detail in this Complaint amount to "intrusions" on Plaintiffs' and the Class Members' properties.

78.     Defendants' spill has entered or intruded or soon will enter or intrude on the properties of Plaintiffs and the Class Members without privilege, permission, invitation, or justification.

79.     Defendants had a duty to use reasonable care not to enter or intrude on Plaintiffs' properties. Defendants also owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

80.     Defendants had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with deep drilling from floating platforms and the especially high risk of blowouts during cementing work.

81.     Defendants breached duty they owed to Plaintiffs and Class Members when they failed to exercise reasonable care in the manufacture, maintenance, and

operation of the Deepwater Horizon, which conduct resulted in entry or intrusion on Plaintiffs' and Class Members' properties.

82.    Defendants knew or should have known that their conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the properties and caused, and continues to cause, harm to Plaintiffs' and Class Members' properties.

83.    The entry or intrusion onto Plaintiffs' and Class Members' properties has and will interfere with their use and enjoyment of their properties and caused, and continues to cause, harm and value loss to Plaintiffs' and Class Members' properties.

84.    As a direct and proximate result of Defendants' negligent trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss, and loss of enjoyment of real property.

85.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

## SECOND CLAIM FOR RELIEF
### Intentional Trespass

86.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

87.    Defendants' conduct and the resulting events as described in detail in this Complaint amounted to intentional intrusions on the properties.

88.    Defendants' spill has entered or intruded or will soon enter or intrude on the property of Plaintiffs and Class Members without privilege, permission, invitation, or justification.

89.    The entry or intrusion on to the Plaintiffs' and Class Members' properties also interfered with their right of exclusive possession of their property.

90.    The entry or intrusion onto the Plaintiffs' and Class Members' properties also interfered with the use and enjoyment of their properties and caused harm to their properties.

91.    As a direct and proximate result of Defendants' intentional trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income, other economic loss, and loss of enjoyment of real property.

92.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

### THIRD CLAIM FOR RELIEF
#### Negligence

93.    The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

94.    Defendants owed a duty to Plaintiffs and all Class Members to exercise reasonable care in the manufacture, maintenance, and operation of the Deepwater Horizon.

95.     Defendants had a heightened duty of care to Plaintiffs and the Class Members because of the great danger associated with deep drilling from floating platforms and the especially high risk of blowouts during cementing work.

96.     Defendants breached that duty when they failed to take appropriate steps to ensure the safety and integrity of the drilling platform, the wellbore during the cementing work, and the BOP valves.

97.     As a direct and proximate result of Defendants' failure to take appropriate steps to ensure the safety of the Deepwater Horizon, Plaintiffs and the Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to property damage, diminution of value of real estate, loss of income, other economic loss and loss enjoyment of real property.

98.     The blowout explosion, fire, and resulting spill were caused by the joint negligence of the Defendants.

99.     Upon information and belief, Plaintiffs allege that the disaster was the result of Defendants' joint negligence in, among other things:

(a)     Failing to properly maintain and/or operate the Deepwater Horizon;

(b)     Operating the Deepwater Horizon in such a manner that an explosion and fire occurred onboard, causing it to sink and resulting in an oil spill;

(c)     Failing to properly inspect the Deepwater Horizon to assure that all equipment and personnel were fit for their intended purpose;

(d)     Acting in a careless and negligent manner;

25

(e)     Failing to promulgate, implement, and enforce proper rules and regulations to ensure the safe operations of the Deepwater Horizon, which would have prevented the disaster;

(f)     Failing to take appropriate action to avoid or mitigate the accident, despite warning signs;

(g)     Negligently implementing policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

(h)     Failing to ensure that the Deepwater Horizon and its equipment were free from defects and/or in proper working order;

(i)     Failing to timely warn;

(j)     Failing to timely bring the oil release under control;

(k)     Failing to provide appropriate disaster prevention equipment;

(l)     Intentionally pumping enormous quantities of toxic dispersants into the Gulf of Mexico;

(m)     Acting in a manner that justifies imposition of punitive damages; and

(n)     Such other acts and omissions as will be shown at the trial of this matter.

100.    The injuries to Plaintiffs and the Class Members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

101. Furthermore, the disaster would not have occurred had the Defendants exercised a high degree of care. Plaintiffs, therefore. plead the doctrine of *res ipsa loquitur*.

102. Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable to Plaintiffs and the Class Members for damages suffered as a result of Defendants' acts and omissions.

## FOURTH CLAIM FOR RELIEF
### Gross Negligence

103. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

104. Defendants owed a duty to Plaintiffs and all Class Members to exercise reasonable care in the manufacture, maintenance. and operation of the Deepwater Horizon.

105. Defendants had a heightened duty of care to Plaintiffs and the Class Members because of the great danger associated with deep drilling from floating platforms, and the especially high risk of blowouts during cementing work such as the Deepwater Horizon was performing at the time of the explosion.

106. Defendants breached their legal duty to Plaintiffs and the Class, failed to exercise reasonable care, and acted with reckless, willful, and wanton disregard for Plaintiffs and the Class Members, and their property, in the negligent manufacture, maintenance, and/or operation of the Deepwater Horizon.

27

107.   Defendants knew or should have known that their wanton or reckless conduct would foreseeably result in a disastrous blowout and oil spill, causing damage to the economic interests of individuals and businesses in the area affected by the oil spill.

108.   As a direct and proximate result of Defendants' wanton or reckless conduct, Plaintiffs and Class Members have suffered legal injury and damages, in amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income, other economic loss, and loss of enjoyment of real property.

109.   As a direct and proximate result of Defendants' gross negligence, Plaintiffs and Class Members have suffered actual and threatened legal injury for which there is no adequate remedy at law, making preliminary and final injunctive relief appropriate.

110.   Defendants' wanton or reckless conduct, as described herein, entitle Plaintiffs and Class Members to punitive damages.

### FIFTH CLAIM FOR RELIEF
### Nuisance

111.   The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

112.   Defendants' conduct has directly and proximately resulted in continuing and unreasonable interference with the use and enjoyment of properties owned by Plaintiffs and Class Members and constitutes a nuisance.

113.   Defendants' inadequate manufacture, maintenance, and operation of the Deepwater Horizon was unreasonable.

28

114. As a direct and proximate result of Defendants' unreasonable conduct, Plaintiffs and Class Members have suffered unreasonable or substantial annoyances and unreasonable or substantial interference with the use and enjoyment of their properties, including, but not limited to, extensive destructions and contamination of their real and personal property and environment, resulting in damage in an amount to be proven at trial, including, but not limited to, real and personal property damage, diminution of value of real estate, loss of income and other economic loss, and loss of enjoyment of real property.

**SIXTH CLAIM FOR RELIEF**
**Negligence *Per Se***

115. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

116. Defendants' conduct with regard to the manufacture, maintenance, and/or operation of drilling operations and oil rigs such as the Deepwater Horizon is governed by numerous state and federal laws, and permits issued under the authority of these laws.

117. These laws and permits create statutory standards that are intended to protect and benefit Plaintiffs and the Class Members.

118. Defendants' violations of these statutory standards constitute negligence *per se* under Florida law.

119. Defendants' violations of these statutory standards proximately caused Plaintiffs' and the Class Members' injuries, warranting compensatory and punitive damages.

29

## SEVENTH CLAIM FOR RELIEF
## Strict Liability for Abnormally Dangerous Activity

120.   The allegations in all preceding paragraphs are incorporated by reference as though fully set forth here.

121.   Defendants engaged in abnormally dangerous activities by the manner in which they maintained and operated the Deepwater Horizon.  Defendants' activities resulted in the intentional, incidental, or accidental explosion, fire, and resulting oil spill from the Deepwater Horizon, which (a) created a high degree of risk of harm to others and particularly to Plaintiffs and Class Members; (b) created a risk involving a likelihood that the harm threatened by Defendants' activities would be great; (c) created a risk of harm that could not be avoided by the exercise of reasonable care; (d) were not a matter of common usage; (e) were inappropriate to the place that they were being carried on, in that they constituted a non-natural use of the waters of the Gulf of Mexico, in close proximity to Florida's beaches and marinas, which imposed an unusual and extraordinary risk of harm to Plaintiffs' and Class Members' property.

122.   As a direct and proximate result of Defendants' conduct in engaging in the abnormally dangerous activities alleged above, substantial amounts of crude oil has been released and continue to be released from the Macondo well leased by 21 Defendants have further released and continue to release unprecedented quantities of toxic dispersants into the Gulf of Mexico. It is precisely that risk of the type of harm that is being sustained by Plaintiffs and the Class Members that makes Defendants' activities abnormally dangerous.

123. Plaintiffs and the Class Members are entitled to a judgment finding Defendants liable for damages, including punitive damages, suffered as a result of Defendants' abnormally dangerous activities and awarding Plaintiffs and the Class Members adequate compensation therefore in amounts determined by the trier of fact.

### EIGHTH CLAIM FOR RELIEF
### Strict Products Liability for Manufacturing Defect

124. The allegations in all preceding paragraphs are incorporated by reference as though fully set forth herein.

125. Defendant Cameron manufactured and/or supplied the Deepwater Horizon's BOP.

126. At the time of, and since the explosion, Defendant Cameron's BOP failed to operate properly or at all, and this failure caused or contributed to the spill.

127. Defendant Cameron's BOP was defective because it failed to operate as intended, either by manual trigger or by automatic trigger.

128. As a result of the BOP product defect, oil was discharged and continues to be discharged from the Deepwater Horizon, causing injury to Plaintiffs and the Class Members.

129. Defendant Cameron's BOP was in a defective condition and unreasonably dangerous to Plaintiffs and Class Members when the BOP left Defendant Cameron's control.

130. At all times, Defendant Cameron's BOP was used in the manner intended.

31

131.   By reason of the foregoing, Plaintiffs and Class Members have incurred damages in an amount to be determined at trial, and are entitled to compensatory and punitive damages.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members demand judgment against Defendants, jointly and severally, as follows:

A. An order certifying the Class as set forth herein, appointing Plaintiffs as Class Representatives, and appointing undersigned counsel as counsel for the Class;

B. Economic and compensatory damages in amounts to be determined at trial;

C. Punitive damages;

D. Pre-judgment and post-judgment interest at the maximum rate allowable by law;

E. Attorneys' fees and costs; and

F. Such other and further relief available under all applicable state and federal laws and any relief the Court deems just and appropriate.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

Dated: June 10, 2010

**Spiro J. Verras, Trial Counsel**
Florida Bar No. 0479240
**Paul A. Gionis**
Florida Bar No. 0560243
**Michael Bilirakis**

Florida Bar No. 0006104
BILIRAKIS LAW GROUP, LLC.
4538 Bartelt Road
Holiday, FL 34690
Telephone: (727) 937-3226
Facsimile:   (727) 934-5069
Email: sverras@bilirakislaw.com